WILKINS, Circuit Judge,
dissenting:
The majority affirms the dismissal of Big Red’s suit pursuant to Fed.R.Civ.P. 12(b)(6), concluding that Big Red has no claim against Davines under the North Carolina Unfair Trade Practices Act (UTPA), see N.C. Gen.Stat. § 75-1.1 (1999). I respectfully dissent.
I.
The majority opinion appears to be premised on what the majority understands to be the relationship between the UTPA and traditional contract law. According to the majority, Big Red’s UTPA *226 claim represents an effort to “circumvent the statute of frauds (and achieve perhaps an even better financial result) by pursuing an action for treble damages” under § 75-1.1. Ante at-. This characterization does not recognize that § 75-1.1 does more than merely authorize enhanced damages for aggravated breach of contract. Section 75-1.1 creates an independent cause of action that was specifically designed to provide relief in situations where “common law remedies had proved often ineffective.” Marshall v. Miller, 302 N.C. 539, 276 S.E.2d 397, 400 (N.C.1981); see also id. at 402 (rejecting notion that recovery under UTPA is limited “to cases where some recovery at common law would probably also lie”). The UTPA cause of action is “broader than traditional common law actions,” id. at 402, and is not constrained by doctrines traditionally applied in common law breach of contract actions, see Bernard v. Cent. Carolina Truck Sales, Inc., 68 N.C.App. 228, 314 S.E.2d 582, 584 (N.C.Ct.App.1984).
The distinctive character of the UTPA is reflected in the many precedents decoupling UTPA actions from breach of contract actions. Thus, on the one hand, a mere breach of contract does not give rise to a claim under § 75-1.1. See Computer Decisions, Inc. v. Rouse Office Mgmt. of N.C., Inc., 124 N.C.App. 383, 477 S.E.2d 262, 266 (N.C.Ct.App.1996). On the other hand, neither the statute itself nor the pertinent North Carolina case law requires proof of any contractual relationship between the plaintiff and the defendant. See Prince v. Wright, 141 N.C.App. 262, 541 S.E.2d 191, 196 (N.C.Ct.App.2000) (noting that UTPA claims usually involve buyer-seller relationships but “courts have also recognized actions based on other types of commercial relationships, including those outside of contract.”). The test applied to the defendant’s acts is not whether they were proscribed by an enforceable agreement, but rather whether they “offend[ed] established public policy” or were “immoral, unethical, oppressive, unscrupulous, or substantially injurious.” Walker v. Sloan, 137 N.C.App. 387, 529 S.E.2d 236, 243 (N.C.Ct.App.2000) (internal quotation marks omitted).
In light of the purposes of the UTPA and the principles enunciated by the North Carolina courts, the traditional strictures of contract law — such as the statute of frauds — should not be imported into the UTPA context. See Marshall, 276 S.E.2d at 400 (noting that UTPA was enacted partly because of obstacles to relief in breach of contract actions). On the contrary, regardless of whether a plaintiff has a viable breach of contract claim, the UTPA will afford a remedy if the defendant engaged in conduct such as fraud, see Norman v. Nash Johnson & Sons’ Farms, Inc., 140 N.C.App. 390, 537 S.E.2d 248, 266 (N.C.Ct.App.2000), review denied, 547 S.E.2d 13, 14 (N.C.2001); breach of a fiduciary duty, see id.; intentional misrepresentations inducing reliance, see Bernard, 314 S.E.2d at 584; or “an inequitable assertion of [the defendant’s] power or position,” see Walker, 529 S.E.2d at 243 (internal quotation marks omitted).
Big Red’s allegations, which we are bound to accept at this early stage of the litigation, unquestionably describe conduct of this nature. Big Red pled a fraud claim in its complaint, see J.A. 26-28, and all of the allegations supporting this claim were incorporated by reference into the UTPA claim, see id. at 29. In addition, the complaint alleges that Davines falsely assured Big Red that a Master Distribution Agreement would be signed and then “instructed Big Red to proceed with the necessary arrangements,” id. at 19; Big Red responded by leasing a warehouse and ordering a large quantity of Davines products for distribution. In other words, the *227 complaint alleges that Davines intentionally made false statements to promote its own interests, and that Big Red relied on these falsehoods to its detriment. Such behavior includes misrepresentations inducing reliance and an “inequitable assertion” of Davines’ position, both of which are actionable under the UTPA.
Notwithstanding these allegations, the majority concludes that relief on Big Red’s UTPA claim is barred by a provision of contract law — the statute of frauds. As noted above, however, such contract law concepts do not apply to UTPA claims.
II.
According to the majority, two precedents — Computer Decisions and Process Components, Inc. v. Baltimore Aircoil Co., 89 N.C.App. 649, 366 S.E.2d 907 (N.C.Ct. App.), aff'd, 323 N.C. 620, 374 S.E.2d 116 (N.C.1988) (per curiam) — together establish that UTPA relief is unavailable to Big Red due to the absence of a binding written agreement. I believe the majority reaches this conclusion based on its importation of contract law into the UTPA context.
A.
In Process Components, the defendant (“BAC”) promised the plaintiff (“PRO-COM”) exclusive rights to distribute BAC products to certain customers; as a result of these promises, PROCOM leased a warehouse and incurred other expenses in preparation for becoming a BAC distributor. See id. at 909. BAC later revealed, however, that it was still bound by a previous agreement with another distributor, which prevented PROCOM from obtaining the exclusive distributorship rights that it had been promised. See id. The North Carolina Court of Appeals held that “[t]he evidence of [BAC’s] misrepresentations clearly supports the court’s conclusion that [BAC’s] unfair or deceptive acts or practices caused injury to [PROCOM].” Id. at 911.
The same court rejected the imposition of UTPA liability in Computer Decisions. In that case, the plaintiff (“CDI”) sought to lease office space from the defendant (“Rouse”). See Computer Decisions, 477 S.E.2d at 263. After the parties orally agreed as to some but not all terms of the lease, a Rouse vice-president assured CDI’s president, “We have a deal.” Id. at 264 (internal quotation marks omitted). The parties then negotiated further and exchanged draft leases for approximately six weeks until Rouse informed CDI that it had decided to lease the space in question to another tenant. See id. At that point, Rouse knew that CDI had only one month left on its existing lease. See id. The appellate court held that CDI was not entitled to relief because it had not shown “substantial aggravating circumstances attendant to the breach” of the (unenforceable) oral lease. Id. at 266.
The distinction between these cases lies in the extent of the deceptions practiced by each defendant. In Process Components, the jury found that BAC falsely represented certain crucial facts. See Process Components, 366 S.E.2d at 910. The opinion in Computer Decisions does not indicate that CDI made comparable allegations about Rouse’s conduct.*
*228 In light of this distinction, the present case is controlled by Process Components, not Computer Decisions. Big Red specifically alleged that Davines made false representations regarding the proposed Master Distribution Agreement. Big Red further alleged that these misrepresentations were intended to induce reliance and resulted in injury to Big Red. There is no indication in Computer Decisions that CDI made similar allegations. In Process Components, by contrast, circumstances of this nature were proven to the jury and were deemed to support UTPA liability. This precedent compels reversal of the judgment in favor of Davines.
B.
According to the majority, the crucial distinction between Computer Decisions and Process Components is not the nature of the allegations but rather the fact that the parties in Process Components ultimately formed a written agreement, while the parties in Computer Decisions did not. Thus, the majority treats the existence of a written contract as a dispositive consideration in Process Components. However, in its analysis of PROCOM’s UTPA claim, the North Carolina Court of Appeals did not mention or even indirectly refer to the existence of a contract. See Process Components, 366 S.E.2d at 910-11. This is not surprising, because the contract was created after the events underlying PROCOM’s claim — BAC’s misrepresentations and PROCOM’s detrimental reliance on them. In other words, the UTPA violation was complete before any contract existed.
To hold that BAC became liable for precontractual misrepresentations only because a contract was subsequently formed and reduced to writing is inimical to the purposes underlying the UTPA. As discussed above, § 75-1.1 was enacted to provide relief for unscrupulous behavior that might not give rise to traditional tort or breach of contract actions. An approach that makes relief under § 75-1.1 depend on subsequent contract formation allows the scoundrels of the business world to avoid UTPA liability by simply breaking off negotiations once their deceptions have served their purpose.
Furthermore, the opinion in Computer Decisions does not support the majority’s conclusion that the absence of a written contract precluded UTPA relief in that case. The state court held that the statute of frauds barred relief on CDI’s breach of contract claim. See Computer Decisions, 477 S.E.2d at 265. As to the UTPA claim, however, the court expressly acknowledged that a claim under § 75-1.1 will lie when the breach of an (unenforceable) oral lease is accompanied by aggravating circumstances. See id. at 266. This acknowledgment contradicts the majority’s implicit conclusion that a written (and therefore enforceable) contract is a condition precedent to UTPA relief for false representations occurring during the negotiation of an agreement subject to the statute of frauds.
It is true that the Computer Decisions court noted the absence of an enforceable contract as one circumstance distinguishing that case from an earlier decision. See id. (distinguishing Mosley & Mosley Builders, Inc. v. Landin Ltd., 97 N.C.App. *229 511, 389 S.E.2d 576 (N.C.Ct.App.1990)). But the contract in Mosley was in effect at the time of the defendant’s misconduct. See Mosley, 389 S.E.2d at 577-78 (describing dispute arising from conflicting interpretations of lease). Thus, neither Computer Decisions nor Mosley supports the majority’s determination that contract formation after the defendant’s deceptive acts is relevant to a UTPA claim. At most, Computer Decisions establishes that the existence of an enforceable written agreement at the time of a defendant’s misrepresentations may assist the plaintiff in making its UTPA claim. The absence of such an agreement does not preclude relief here, however, because all the circumstances that supported UTPA liability in Process Components — deliberate misrepresentations and ensuing injury — are also alleged here.
For the foregoing reasons, I dissent.

 In concluding that Computer Decisions is directly on point, the majority "assume[s] that [CDI] claimed that [Rouse’s] representation was false and intended to encourage [CDI] to rely upon the statement and not seek space elsewhere.” Ante at 222 n. 1. In essence, the majority assumes that a failed UTPA claim was pled with all the elements of a viable UTPA claim and then bootstraps from that assumption to a redefinition of the requirements of § 75-1.1. While the majority "see[s] no other way to read” Computer Decisions, *228 id., I think the text supports a different interpretation: In order for a plaintiff to prevail on a UTPA claim arising from the breach of an oral lease, "substantial aggravating circumstances attendant to the breach must be shown. This the plaintiff has not done.” Computer Decisions, 477 S.E.2d at 266 (citation omitted). In other words, CDI's claim failed because CDI did not allege aggravating circumstances such as deliberate misrepresentations or an intention to induce reliance.